UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD MULLINS,<br><br>    Plaintiff,<br><br>v.<br><br>NEW YORK MARINE & GENERAL INSURANCE COMPANY,<br><br>    Defendant. | Case No. 17-cv-02518-JST<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT; ORDER SETTING CASE MANAGEMENT CONFERENCE**<br><br>Re: ECF Nos. 26, 27 |

Before the Court are the parties' cross-motions for partial summary judgment. ECF Nos. 26, 27. The Court will grant Plaintiff's motion and deny Defendant's motion.

## I. BACKGROUND

The following facts are undisputed: Plaintiff Edward Mullins owns and operates Adams Springs Golf Course. ECF No. 26 at 1; ECF No. 27-5 ¶ 1. Defendant New York Marine and General Insurance Company ("NYMGIC") issued a commercial property insurance policy to Mullins dba Adams Springs Golf Course, LLC. ECF No. 27-8 ¶ 1. The policy includes coverage for business income loss, with a "limit of $500,000 for business income and extra expense claims combined." ECF No. 27-8 ¶¶ 1, 9. Mullins's policy includes the following terms:

> **A. Coverage**
>
>     **1. Business Income**
>     Business Income means the:
>     a. Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and
>     b. Continuing normal operating expenses incurred, including payroll. . . .
>
> We [the insurance company] will pay for the actual loss of Business Income you [the named insured] sustain due to the necessary "suspension" of your "operations" during the "period of restoration." . . .

      **2. Extra Expense** . . .
         b. Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss. . . .

**C. Loss Conditions**
    **3. Loss Determination**
      a. The amount of Business Income loss will be determined based on:
        (1) The Net Income of the business before the direct physical loss or damage occurred;
        (2) The likely Net income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;
        (3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and
        (4) Other relevant sources of information, including:
          (a) Your financial records and accounting procedures;
          (b) Bills, invoices and other vouchers; and
          (c) Deeds, liens or contracts.

ECF No. 27-9 at 70, 75.

In September 2015, a fire "destroyed portions of Plaintiff's golf course property, golf course buildings, and personal property," and Mullins made a business income claim for $584,206.00 against the policy. ECF No. 27-8 ¶¶ 2-5. NYMGIC paid $2,709.98 towards that claim on November 10, 2016, and agreed to pay an additional $107,708.35 on October 31, 2017 – the date on which the cross-motions were filed. Id. ¶¶ 7-8; ECF Nos. 26-27. NYMGIC "has paid $266,603.95 towards extra expenses, leaving $122,977.72 as the remaining policy limit applicable to Plaintiff's business income claims once Defendant makes the additional payment of $107,708.35." ECF No. 27-8 ¶ 9. The "period of restoration" runs until at least September 2018. ECF No. 27 at 15 (projecting the period to run "through September 11, 2018"); ECF No. 29 at 8 ("agree[ing] the period of restoration runs to September 2018").

The parties dispute Mullins's entitlement to the remaining $122,977.72. Their cross-motions ask the Court to interpret the policy terms governing loss of business income. Mullins

1 also asks the Court to find that he is entitled to payment of $122,977.72.

## II. LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if there is sufficient evidence "such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When deciding a motion for summary judgment, the court must draw "all justifiable inferences" in the nonmoving party's favor and may not weigh evidence or make credibility determinations. Id. at 255.

Where the party moving for summary judgment would bear the burden of proof at trial, that party "has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc., 213 F.3d 474, 480 (9th Cir. 2000). Where the party moving for summary judgment would not bear the burden of proof at trial, that party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party satisfies its initial burden of production, the nonmoving party must produce admissible evidence to show that a genuine issue of material fact exists. Id. at 1102-03. If the nonmoving party fails to make this showing, the moving party is entitled to summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

## III. DISCUSSION

### A. Policy Interpretation

The parties dispute how to interpret the policy's use of the word "and" between the two components of "Business Income": "a. Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; *and* b. Continuing normal operating expenses incurred, including payroll." ECF No. 27-9 at 70 (emphasis added). Mullins contends that "and" means that the policy covers two distinct components of business income – net income and continuing

3

operating expenses – without one offsetting the other, and that he can therefore recover continuing operating expenses without any consideration of net profit or loss. NYMGIC, by contrast, argues that "and" means that net income and continuing operating expenses must be added together to determine business income, and that any net loss must therefore be deducted from the amount of continuing operating expenses when calculating the payout for lost business income.

In <u>Amerigraphics, Inc. v. Mercury Casualty Co.</u>, 182 Cal. App. 4th 1538 (2010), <u>disapproved of on other grounds</u>, <u>Nickerson v. Stonebridge Life Ins. Co.</u>, 63 Cal. 4th 363 (2016), the California Court of Appeal interpreted policy language that is nearly identical to the disputed language in this case:[1]

> The business-interruption coverage, titled "Business Income," provides in relevant part: "We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.' . . . . [¶] Business Income means the: [¶] (i) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred *if no physical loss or damage had occurred* . . . .; and [¶] (ii) Continuing normal operating expenses incurred, including payroll."

<u>Id.</u> at 1544 (second omission in original) (emphasis added).[2] As the trial court had done below, the Court of Appeal held "that under the plain meaning of this policy, an insured is entitled to be paid under both subparts without having to offset the two amounts in the event operating expenses exceed net income." <u>Id.</u> at 1543. The court noted that "the policy does not use the words 'plus,' 'offset,' 'subtract,' 'minus,' or the like. It uses the word 'and.' The plain meaning of 'and' is consistent with Amerigraphics's and the trial court's interpretation." <u>Id.</u> at 1552. In reaching this conclusion, the court rejected two out-of-state cases that "construed the identical business-income provision at issue here in the same manner" as the insurance company proposed in that case, and

---

[1] The only difference is that the italicized language does not appear in NYMGIC's policy to Mullins. The distinction is immaterial.

[2] In <u>Nickerson</u>, the California Supreme Court held that, "[i]n determining whether a punitive damages award is unconstitutionally excessive, <u>Brandt</u> fees may be included in the calculation of the ratio of punitive to compensatory damages, regardless of whether the fees are awarded by the trier of fact as part of its verdict or are determined by the trial court after the verdict has been rendered." 63 Cal. 4th at 368. It disapproved the decision in <u>Amerigraphics</u> "to the extent it is inconsistent with this holding." <u>Id.</u> at 377 n.2. The <u>Amerigraphics</u> court's interpretation of the policy language at issue in this case remains good law.

4

as NYMGIC proposes here. Id. at 1552-53 (disagreeing with Cont'l Ins. Co. v. DNE Corp., 834 S.W.2d 930 (Tenn. 1992), and Dictiomatic, Inc. v. U.S. Fid. & Guar. Co., 958 F. Supp. 594 (S.D. Fla. 1997)).

The defendant argued that the trial court's interpretation rendered the term "Net Loss" superfluous "because the insurer would owe no benefits under subpart (i) if the business had been operating at a loss prior to its suspension," but the Court of Appeal rejected this argument. Amerigraphics, 182 Cal. App. 4th at 1553. The court explained that its interpretation of the policy language "does not render the term 'Net Loss' superfluous. Rather, in the event that there is a net loss, the insured's entitlement to benefits for loss of 'net income' is zero." Id. Finally, the court went on to explain that, even if it assumed the insurance company's interpretation of the language were reasonable and the plain language were therefore ambiguous, it would interpret the language in the same way:

> We resolve an ambiguity in interpreting the ambiguous provision in the sense the insurer believed the insured understood it when the contract was made (i.e., we must determine whether coverage is consistent with the insured's objectively reasonable expectations).
>
> As Amerigraphics points out, if a catastrophic event damages an insured's business premises and prevents the insured from being able to operate, any business in that situation would face two distinct problems: (1) a loss of money coming into the business (loss of income), *and* (2) payment of ongoing fixed expenses, even though no money is coming in. A reasonable insured would see that the definition of "Business Income" has two distinct components: (i) net income, and (ii) continuing normal expenses. Because the definition provides that "Business Income" includes both items, a reasonable insured relying on the plain language of the clause would reasonably conclude that the policy covers both items. Indeed, we note that the "Business Income" provision appears in the policy under the preceding heading of "Additional Coverages." Given its placement in the policy and the plain language of the provision, it would be objectively reasonable for an insured purchasing the policy to construe it as protecting both its lost income stream and as defraying the costs of ongoing expenses until operations were restored.
>
> Under both parties' interpretation, an insured business will be paid if the business were operating at a profit prior to the covered loss. It is only when a business was operating at a net loss greater than its operating costs that it would not be paid at all under Mercury's interpretation. But there is nothing in the policy language to suggest to an insured that if a business is not earning a profit it should not expect coverage for its continuing expenses during the period it cannot operate. It is not unusual for business income to fluctuate

5

> from year to year. A business should not have to be concerned that if it does poorly for one or two years and a covered catastrophic loss occurs during that time frame, then the business will not be paid anything under the "Business Income" provision. In essence, Mercury's interpretation relies on the implied assumption that only a profitable business would be protected by the provision. A business that is just starting out may operate at a temporary loss until it becomes established and secures a customer base. If that business knew that there would be no coverage under the "Business Income" provision of the policy for ongoing expenses if it suffered a catastrophic loss under the policy, there would be no point for that business to purchase the additional coverage.
>
> As drafted, the plain meaning of the language in this Mercury policy would lead an ordinary insured to conclude that, in the event of a covered loss that forced the complete suspension of its business operations, the policy would provide coverage for any lost profits, and even if there were no lost profits, for ongoing expenses incurred during the period of suspension. We are satisfied that the trial court correctly construed the policy.

Id. at 1553-54 (citation omitted).

Mullins argues that Amerigraphics is dispositive here and requires the Court to rule for him. NYMGIC responds that Amerigraphics never actually addressed the issue before this Court. See ECF No. 26 at 13 ("Amerigraphics is not controlling because it did not address the 'actual loss of business income' coverage grant, nor did it address the 'Loss Determination' provision."). The Court rejects this argument. The Amerigraphics court's description of the issue before it could not have been more on point:

> First, what is the meaning of the "Business Income" coverage in the policy which states that Mercury will pay an insured during its period of suspended business operation the "(i) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred . . . ; and [¶] (ii) Continuing normal operating expenses incurred, including payroll"? We agree with the trial court that under the plain meaning of this policy, an insured is entitled to be paid under both subparts without having to offset the two amounts in the event operating expenses exceed net income.

182 Cal. App. 4th at 1543. Clearly, the court was not simply interpreting the definition of "business income" without considering the requirement of "actual loss." The policy language at issue covered only "actual loss of Business Income," and the court necessarily considered the "actual loss" requirement when it reached its conclusion regarding when "an insured is entitled to be paid." Id. at 1543-44.

6

Where, as here, the state's highest court has been silent on an issue, "[a] state appellate court's announcement of a rule of law is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." Poublon v. C.H. Robinson Co., 846 F.3d 1251, 1266 (9th Cir. 2017) (internal quotation marks and citation omitted). NYMGIC makes several creative arguments about what might constitute "persuasive data," but none of them is convincing. First, it notes that the California Supreme Court disapproved of Amerigraphics in Nickerson, but that was on an entirely different issue. That the Supreme Court disagreed with the Amerigraphics court's handling of punitive damages says nothing about how it might view other conclusions reached by that court.

Second, NYMGIC argues that Amerigraphics is inconsistent with two California appellate cases, but those cases concerned different questions of law than the one addressed in Amerigraphics. In Pacific Coast Engineering Co. v. St. Paul Fire & Marine Insurance Co., the court held that a policy of business interruption insurance "provides coverage only for losses resulting directly from interruption of the business." 9 Cal. App. 3d 270, 275 (1970). The court explained that there was no "interruption of the business" once plaintiff's manufacturing plant re-opened, and that the plaintiff therefore could not claim damages resulting from delayed delivery of a barge on which plaintiff itself chose not to resume work after the plant re-opened. Id. at 273-75. The court did not examine how to calculate losses following the interruption of a business. Likewise, in Buxbaum v. Life & Casualty Co., the court concluded that the plaintiff was not entitled to business interruption benefits because "a total cessation of business activity must occur" for there to be a "suspension of operations," and the plaintiff in that case had merely reduced business operations. 103 Cal. App. 4th 434, 446-51 (2002). NYMGIC makes much of the language in Buxbaum that, "[b]usiness interruption coverage operates to compensate the insured for losses stemming from the business interruption: lost profits, loss of earnings, and continuing expenses during the period of repair or restoration of property damaged or destroyed by reason of a covered peril." Id. at 443 (quoting 11 Couch on Insurance § 167:9 (3d ed. 1998)). However, this language allows recovery of "continuing expenses" – the very type of loss that

Mullins seeks to recover – and does not indicate that claims for such expenses must be reduced if a business is projected to operate at a net loss rather than a net profit. Buxbaum also quoted Dictiomatic's statement that "[b]usiness interruption insurance is intended to return to the insured's business the amount of profit it would have earned had there been no interruption of the business ('suspension of operations')." Id. (internal quotation marks omitted) (quoting Dictiomatic, 958 F. Supp. at 603). But the Buxbaum court was focused on whether there had been a "suspension of operations" and did not address, let alone decide, whether the two components of business income must be aggregated to determine an insured's recovery. Neither Buxbaum nor Pacific Coast Engineering presents persuasive data that the California Supreme Court would disagree with Amerigraphics.

NYMGIC also argues that the rule established by Amerigraphics is contrary to provisions of the California Insurance Code. These arguments are not persuasive. California Insurance Code sections 251 and 252, which prohibit, respectively, insurance against a "lottery or its outcome" and a policy "executed by way of gaming or wagering," are facially inapplicable. California Insurance Code section 284 provides that "the measure of an insurable interest in property is the extent to which the insured might be damnified by loss or injury thereof," and section 280 states that, "[i]f the insured has no insurable interest, the contract is void." NYMGIC argues that the Amerigraphics interpretation of "loss of business income" would render the contract void because it would provide for coverage beyond an insured's actual loss, which NYMGIC contends is measured by the sum of net profits or loss and continuing operating expenses. However, as the Amerigraphics court described in the excerpt cited at length above, the policy covers "two distinct components": net profits and continuing operating expenses. 182 Cal. App. 4th at 1553. NYMGIC cites no California authority for the proposition that both components must be considered together as a single insurable interest, rather than as two distinct insurable interests.[3] NYMGIC repeatedly argues that Amerigraphics's policy language interpretation results in a potential "windfall" for policy holders, because a business that was losing money before an

---

[3] The Court addresses below NYMGIC's reliance on out-of-state authorities.

interruption can potentially recover more in insurance proceeds after the interruption than it would have earned had the business kept operating. As that court noted, however, this would not be a windfall because the insured would be recovering not an unearned or unexpected advantage, but instead an insurance benefit for the "payment of ongoing fixed expenses."[4] Id. That "the insured's entitlement to benefits for loss of 'net income' is zero" does not cause the receipt of payment for a separate insurable interest to be a windfall. Id. And the contrary interpretation urged by NYMGIC would lead to an even more unjust result: "[I]f a catastrophic event damages an insured's business premises and prevents the insured from being able to operate, any business in that situation would face two distinct problems: (1) a loss of money coming into the business (loss of income), *and* (2) payment of ongoing fixed expenses, even though no money is coming in." Id. at 1553 (emphasis in original). A business that had been suffering a period of losses, but keeping its head above water, would suddenly find itself without the means to continue in operation. Given these choices, it is not surprising that the Amerigraphics court found the policyholder's interpretation more reasonable.

Finally, NYMGIC cites several decisions from other jurisdictions that have reached a conclusion contrary to Amerigraphics. ECF No. 26 at 11-12 & n.13 (citing Polymer Plastics Corp. v. Hartford Cas. Ins. Co., 389 Fed. Appx. 703 (9th Cir. 2010) (applying Nevada law); Dictiomatic, 958 F. Supp. 594; Liberty Mut. Ins. Co. v. Sexton Foods Co., 854 S.W.2d 365 (Ark. Ct. App. 1993); DNE Corp., 843 S.W.2d 930; Cohen Furniture Co. v. St. Paul Ins. Co. of Ill., 573 N.E.2d 851 (Ill. App. Ct. 1991); United Land Investors, Inc. v. N. Ins. Co. of Am., 476 So. 2d 432 (La. Ct. App. 1985)); ECF No. 29 at 5-6 (citing HTI Holdings v. Hartford Cas. Ins. Co., No. 10-6021-AA, 2011 WL 6205903 (D. Or. Dec. 8, 2011); Verill Farms, LLC v. Farm Family Cas. Ins. Co., 18 N.E.3d 1125 (Mass. App. Ct. 2014)). But "[f]ederal courts are required to 'ascertain from all the available data what the state law is and apply it rather than to prescribe a different rule, however superior it may appear from the viewpoint of "general law" and however much the state rule may have departed from prior decisions of the federal courts.'" Poublon, 846 F.3d at 1266 (quoting

---

[4] A "windfall" is "an unexpected, unearned, or sudden gain or advantage." Merriam Webster's Collegiate Dictionary (11th ed. 2012).

9

West v. Am Tel. & Tel. Co., 311 U.S. 223, 236 (1940)). Courts are not "free to choose their own rules of decision whenever the highest court of the state has not spoken." West, 311 U.S. at 236. While it is possible that the California Supreme Court might consider the out-of-state cases persuasive and reach a conclusion contrary to Amerigraphics, the Court cannot conclude that "persuasive data" indicates that it "*would* decide otherwise." Poublon, 846 F.3d at 1266 (emphasis added). Moreover, under California law, "insurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured." TRB Investments, Inc. v. Fireman's Fund Ins. Co., 40 Cal. 4th 19, 27 (2006) (internal quotation marks and citation omitted). The Amerigraphics decision is consistent with that principle, and it explicitly disagreed with the Tennessee and Florida decisions in DNE Corporation and Dictiomatic, which NYMGIC describes as the "leading case[s]." Amerigraphics, 182 Cal. App. 4th at 1552-53; ECF No. 26 at 11. The Court finds that Amerigraphics represents the current law in California, notwithstanding the contrary decisions from other states.

### B. Amount Due

Mullins also asks for a finding that he is entitled to an additional payment of $122,977.72, which is the remaining recovery available under the policy for business income and extra expenses. In its reply brief, NYMGIC "agrees that if Mullins' interpretation of the policy is adopted, the claim amount will exceed the remaining available Business Income/Extra Expense policy limits." ECF No. 31 at 10 n.6. Now that the Court has adopted Mullins's interpretation of the policy, there is no dispute that Mullins is entitled to an additional $122,977.72.

### CONCLUSION

Mullins's motion for partial summary judgment is granted. NYMGIC's motion for partial summary judgment is denied. All evidentiary objections are denied as moot because the Court did not rely on the contested evidence.

/ / /

/ / /

/ / /

/ / /

The Court now sets a Case Management Conference on January 24, 2018 at 2:00 p.m. An updated Joint Case Management Statement is due January 16, 2018.

**IT IS SO ORDERED.**

Dated: December 21, 2017

_____
JON S. TIGAR
United States District Judge